UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>v.<br><br>PALADIN REED MORGAN,<br><br>          Defendant. | Case No. 2:22-cr-00144-SB-1<br><br><br>AMENDED ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS [DKT. NO. 22] |

     Defendant Paladin Reed Morgan got into an altercation with a woman in a parking lot.  The woman called 911 and reported that a man had threatened her with a firearm, and she provided a detailed description of the man and his car.  When the police arrived, the woman directed them to the suspect, Defendant, who unmistakably fit the description given.  The police interviewed the woman, identified as M.G., who confirmed the identity of the suspect and added that she had observed Defendant place the handgun he used to threaten her in the trunk of his car.  The police arrested Defendant for making criminal threats in violation of California Penal Code § 422.  A search of his person and vehicle revealed substantial quantities of drugs along with a handgun in the trunk.  Dkt. No. 22-1 (Ex. A, Police Report) at 2 of 66.  Defendant now moves to suppress this evidence on the grounds that they were obtained in violation of the Fourth Amendment.[1]

---

[1] Defendant also requests that the Court hold an evidentiary hearing because the declarations of certain officers allegedly contradict their body camera footage.  "An evidentiary hearing on a motion to suppress need be held only when the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist."  *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).  Defendant has not satisfied this standard, providing only vague assertions of contradictions (including but one example).  Having reviewed the relevant footage, transcripts, and declarations, the

1

Dkt. No. 22 (Motion). Defendant also alleges that he was interrogated without receiving Miranda warnings in violation of the Fifth Amendment. *Id*. at 10.

I.

On November 30, 2021, M.G. called 911 and reported that Defendant brandished a firearm at her in a 7-Eleven parking lot. Dkt. No. 23 (Ex. B-1, First Gallagher Body Camera) at 8:43–9:48. Based on this report, the following dispatch was issued:

> CALL PR ON ARRIVAL, SUSP M/B, 50 YRS, 507/150, 'BACKWOOD' BEANIE, PLAID PAJAMAS, BRANDISHED HANDGUN AT PR, SUSP VEH SILV MERCEDEZ BENZ S550 LIC 7TF416, PR FLED IN FEAR, PR STANDING BY FOR PD AT MCDONALDS.

Dkt. No. 25-7 at 2 of 5.

Various officers responded to the call and soon arrived at the McDonald's restaurant and the nearby 7-Eleven store. Officer Roberson[2] arrived first, followed almost immediately by Officers John Gallagher and Christopher Halcromb. Ex. B-1 at 7:36. Officers Halcromb and Gallagher immediately noticed M.G., who was honking her horn and waving her hands in an apparent to attempt to get their attention. These two officers approached her eight minutes after the 911 broadcast. Ex. A at 4 of 66; Ex. B-1 at 8:07. M.G. told the two officers:

> I was coming into this McDonalds right here. And that guy, he wouldn't pull out. He starts calling me all kinds of crazy ass names, cussing me out. I tried to pull out and I was going to the 7-11 when I went right there. He kept going back and forth. He pulled out a big ass gun out of his trunk right here and he put it in his waistband,

---

Court finds no material contradictions. Defendant's request for an evidentiary hearing is therefore DENIED.

[2] Officer Roberson was misidentified as Officer Andersen in the Police Report. Dkt. No. 25 (Opposition) at 4, n.2.

> cussing me out, threatening to shoot me. I'm like going crazy, going back and forth. I get in my car. I call 911. They told me to wait right here. I waited for as long as I can. The lady said that it's not safe. So, I went down the street and I waited. And as I was pulling right here, he took the gun back out of his waistband and put it back in the trunk.

Dkt. No. 22-1 (Ex. B-2, Transcript of First Gallagher Body Camera) at 27 of 66. Officer Halcromb then asked if Defendant had pointed the gun at her, and M.G. responded: "Yes, he did. It is on camera at the 7-11 right there." *Id*.

While Officers Gallagher and Halcromb spoke with M.G., Officer Jinho Kang arrived and observed Defendant near a Mercedes-Benz. Both Defendant and the Mercedes-Benz were an accurate match to the description given by the 911 caller. Dkt. No. 23 (Ex. D, Kang Body Camera); *see also* Dkt. No. 25-3 (Kang Decl.) ¶¶ 16, 18. Upon his arrival, Officer Kang concededly detained Defendant and, within a minute, placed him in handcuffs. Dkt. No. 23 (Ex. C, Roberson Body Camera) at 1:00. Soon after, an unidentified woman, who claimed that Defendant was her friend's father, asked why the police were arresting Defendant and explained that it was M.G. who had antagonized Defendant.

Officer Kang then purported to conduct a pat-down search of Defendant. The officer felt a soft bulky object in one of his pockets, moved the fabric of the pocket, and observed that the object appeared to resemble methamphetamine. The government acknowledges that the search exceeded the scope of a frisk permitted by *Terry v. Ohio*, 392 U.S. 1 (1968) and *Minnesota v. Dickerson*, 508 U.S. 366 (1993). Shortly after the search, Officer Gallagher reported over the radio that the 911 caller had identified Defendant as the person who had threatened her with the gun and stated that Defendant had placed the gun in the trunk of the Mercedes-Benz after making the threat. Officer Gallagher stated:

> Hey, it's Gallagher over here on the corner. I'm with the victim. She's saying on two occasions within the last 10 minutes or so, the suspect, which is the one you have in custody . . . pulled out an unknown caliber handgun, brandished it a[t] her and made a threat. And then placed it in the trunk of the Mercedes Benz parked over there.

Ex. B-2 at 28 of 66.

Less than two minutes later, Officer Halcromb, after conferring with Officer Gallagher, radioed the other officers and stated that they had "enough" to search the car. Ex. B-1 at 12:29–37. Officers began searching the car. Dkt. No. 25-4 (Chel Decl.) ¶¶ 7–8. Officer Kang told Defendant he planned to place him in a police car. Ex. D at 7:36. Before placing Defendant in the car, Officer Kang searched Defendant and discovered cocaine, methamphetamine, marijuana, and cash. Ex. D at 8:10–9:53; Kang Decl. ¶ 24. During the search of the trunk, Officer Jonathan Chel found a gun and drugs. Chel Decl. ¶ 8. Officer Chel brought the gun to M.G. and Officer Gallagher, and M.G. confirmed that it was the same gun Defendant had brandished at her. Ex. B-1 at 24:44. Defendant's vehicle was eventually towed to the station for an inventory search. Kang Decl. ¶ 26. Officers Gallagher and Halcromb reviewed security footage from the 7-Eleven to confirm the details of M.G.'s description of her encounter with Defendant. Dkt. No. 23 (Ex. E-1, Second Gallagher Body Camera). Defendant was arrested at the station, read his Miranda rights, and his vehicle was impounded. Ex. A at 6–7 of 66.

II.

The Fourth Amendment prohibits unreasonable searches and seizures. *United States v. Cortez*, 449 U.S. 411, 417 (1981). "As the text makes clear, the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (citation omitted). Defendant argues that he was detained without reasonable suspicion or probable cause and that he and his car were unconstitutionally searched. He seeks to suppress the evidence obtained from these allegedly unlawful searches and seizures.

A.

Defendant first argues that the officers had no reasonable suspicion to detain him. This argument is without merit.

To temporarily detain an individual without a warrant, an officer must have reasonable suspicion that the person stopped is engaged in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). Reasonable suspicion exists when an officer is aware of specific, articulable facts, which together with objective and reasonable inferences, form a basis for suspecting that the person to be detained has committed or is about to commit a crime. *United States v. Salinas*, 940 F.2d 392, 394 (9th Cir. 1991) (citing *Cortez*, 449 U.S. at 416–18). When considering whether a suspicion is reasonable, courts must consider the totality of

the circumstances. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). A suspect is detained, rather than arrested, by a "brief stop, interrogation, and under proper circumstances, a brief check for weapons." *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir. 1987) (describing a Terry stop). On a motion to suppress evidence, the government bears the burden of proof. *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2004) (internal quotations omitted).

Officer Kang undisputedly detained Defendant shortly upon seeing him, by directing his movements and handcuffing him. It is also undisputed that Defendant closely matched the detailed description provided by the 911 caller who claimed that the suspect had brandished a firearm at her. Defendant argues that the officers nevertheless lacked reasonable suspicion because the information from the police call was "uncorroborated and the source was one-step up from being anonymous." Motion at 11. Defendant compares the tip to the one in *Florida v. J.L.*, 529 U.S. 266 (2000), in which an anonymous caller reported a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id*. at 268. In *J.L.*, the Supreme Court observed: "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id*. at 271.

The facts in this case are plainly distinguishable. M.G. was not an "unknown, unaccountable" anonymous tipster who left the officers guessing about the basis of her knowledge of the reported crime. She called 911, gave her phone number, told the dispatcher that she would wait for the police to arrive, stayed at the scene, and submitted to interviews by the officers at the scene. Based on all the relevant circumstances, there can be no doubt that there was at least reasonable suspicion to detain Defendant. *See United States v. Terry-Crespo*, 356 F. 3d 1170, 1177 (9th Cir. 2004) (describing that reliability was "further support[ed] because the caller exposed himself to legal sanction"); *see also Navarette v. California*, 572 U.S. 393, 400 (2014).[3]

---

[3] In *Navarette*, the Supreme Court held that an officer had reasonable suspicion to stop a vehicle based on a 911 call from an unidentified caller who claimed that the vehicle had run her off the road. 572 U.S. at 395. The case for finding reasonable suspicion is substantially greater here than that which was found sufficient there.

5

B.

Defendant next argues that even if there were reasonable suspicion to detain him, he was subjected to conditions that amounted to an arrest unsupported by probable cause. Motion at 6; Dkt. No. 26 (Reply) at 3–4. The facts and the law do not support this argument.

1.

The initial encounter with Defendant was a Terry stop and did not become an arrest because he was handcuffed.

During a Terry stop, police are permitted to "diligently pursue[] a means of investigation that [is] likely to confirm or dispel their suspicions quickly, during which time it [is] necessary to detain the defendant." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). "In distinguishing between a Terry stop and a full-blown arrest, we consider whether a reasonable person would believe that he or she is being subjected to more than a temporary detention, as well as the justification for the use of such tactics, *i.e.*, whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *United States v. Guerrero*, 47 F.4th 984, 985 (9th Cir.), *amended on denial of reh'g*, 50 F.4th 1291 (9th Cir. 2022) (quoting *United States v. Brown*, 996 F.3d 998, 1005 (9th Cir. 2021). Courts "evaluate the severity of the intrusion, the aggressiveness of the officer's actions, and the reasonableness of the officer's methods under the circumstances." *Reynaga Hernandez v. Skinner*, 969 F.3d 930, 940 (9th Cir. 2020) (citation omitted).

The use of handcuffs to "detain[] an individual does not automatically escalate a stop into an arrest," though "it substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop." *Id.* at 941 (cleaned up). However, where a suspect is thought to be armed, the use of such intrusive means "has been held permissible." *Id.* at 940; *see, e.g.*, *Haynie v. Cnty. of Los Angeles*, 339 F.3d 1071 (9th Cir. 2003) (no arrest when motorist who was handcuffed and placed in the back of a patrol car); *United States v. Ford*, 821 F. App'x 742 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2712 (2021) (no arrest when individual handcuffed for officer safety).

Officer's Kang's use of handcuffs was a reasonable means of ensuring officer safety under the circumstances and did not transform the stop into an arrest. Based on the dispatch, the officer had information that Defendant had a firearm

and had used it to instill fear in the 911 caller. When Officer Kang encountered Defendant, it was reasonable for him to be concerned not only that Defendant had a firearm, but also that Defendant was willing to use it in light of his recent threat. For the same reason, it also was reasonable to conduct a pat-down search to check for weapons.[4] By that point, there was no de facto arrest: the encounter had lasted less than two minutes; and the handcuffing, though intrusive, was reasonable in light of the substantial safety concerns. The Court finds that there was no arrest prior to Officer Gallagher's broadcast of the contents of the interview with M.G.

2.

By no later than the transmission of the radio call by Officer Gallagher about his interview with M.G.[5]—which occurred within 30 seconds of Officer's Kang's initial pat-down search—Officer Kang had probable cause to arrest him.

"Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. . . ." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (citations omitted) (cleaned up). In other words, probable cause to arrest requires a reasonable belief that both an offense has been committed and that the suspect was the person who committed that offense. This standard does not depend on an application of rigid rules but instead requires a common-sense evaluation of all the relevant circumstances confronting the officers in the field. *Illinois v. Gates*, 462 U.S. 213, 232 (1983) (rejecting the rigid two-pronged test requiring that an informant's tip rigidly satisfy requirements of "veracity or reliability" and "basis of knowledge"). Nor does this standard consider an officer's subjective thoughts. Probable cause is determined by an objective standard. *Devenpeck v. Alford*, 543 U.S. 146, 153

---

[4] The fact that the search exceeded the scope of a Terry frisk did not necessarily transform the brief detention into an arrest. The relevant question is whether the violation had a material effect on the severity of the intrusion such that a reasonable person would believe "he or she is being subjected to more than a temporary detention." *Guerrero*, 47 F.4th at 985. Based on all the circumstances, the violation did not materially increase the severity of the intrusion here.

[5] The transcript of the report of the interview is found in the record at Dkt. No. 22-1, at 28 of 66; and the receipt of the radio transmission of that report, which can be heard on Officer Kang's body camera, is found in the record at Dkt. No. 23, at 3:21–3:38.

(2004) ("Our cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *Whren v. United States*, 517 U.S. 806, 812–813 (1996) (same).

      The objective facts in this case establish probable cause to arrest Defendant by the time of the initial interview of M.G, if not sooner.  By then, the officers had already received substantial relevant information about the crime and the perpetrator.  In her 911 call, M.G. provided very descriptive information about the suspect that uniquely matched Defendant—down to his beanie, pajamas, and license plate number.  Defendant does not and reasonably cannot contest this fact.  The basis of M.G.'s knowledge in reporting the incident was also apparent:  she had personal knowledge as an alleged victim of a violent crime.  Nor is there any question that M.G. reported a crime—brandishing a firearm in a threatening manner can constitute a serious felony under California law.  Cal. Pen. Code § 422 (criminal threats).  When Officers Gallagher and Halcromb arrived, M.G. immediately provided them with further supporting details of the crime, including that Defendant placed the gun in the trunk of his car after threatening her, which Officer Gallagher disclosed in his radio communication with his fellow officers.

      Defendant's principal attack on the lawfulness of the detention is the reliability of M.G.'s report.  Defendant argues that M.G. was not reliable because of three inconsistencies in her story:  (i) M.G. claimed to have been afraid of Defendant, yet she followed him from the McDonald's to the 7-Eleven; (ii) M.G. claimed Defendant was aggressive and threatened her with a gun, yet she admitted she continued to argue with him and told him she was not afraid of him; and (iii) M.G. claimed that Defendant threatened to shoot her while brandishing a firearm, yet she admitted she did not go very far from him when she was waiting for the police.  None of these alleged inconsistencies demonstrates an absence of probable cause.[6]

---

[6] After Defendant had been arrested, Officers Halcromb and Gallagher speculated about whether M.G. could have been "setting him up," discussed that "she was really not shy about confronting him," and "[s]he got him jammed up."  Dkt. No. 22-1, (Ex. E-2, Transcript of Second Officer Gallagher Body Camera) at 47, 57, and 64 of 66.  As explained in the text following this footnote, these post hoc ruminations do not undermine the existence of probable cause at the time of the arrest.

The probable-cause standard is not a demanding one—and, by definition, does not require the same level of reliability necessary to prove facts by a preponderance of the evidence. See *Alabama v. White*, 496 U.S. 325, 330 (1990) (noting that the required reliability of information increases as the standard of proof increases). When measured by the proper standard, the purported "inconsistencies" in M.G.'s report do not objectively establish that she was unreliable. M.G.'s conduct in confronting Defendant, continuing to argue with him, and following him even after he threatened her with a firearm is surely questionable. But this questionable conduct does not necessarily call into question her veracity as much as it does her temper and judgment. Bad temper and poor judgment all too often accompany volatile human interactions. And even if M.G.'s actions raised questions about her reliability, they did not render her unreliable when viewed through the lens of probable cause. Through that lens, an officer objectively and reasonably could conclude that M.G. was telling the truth about the reported facts. There were substantial indicia of reliability, starting with the fact that M.G.'s report "evidenced first-hand information from a crime victim laboring under the stress of recent excitement." *Terry-Crespo*, 356 F.3d at 1176. Moreover, M.G. not only disclosed her identity when she called 911, she also told the dispatcher that she would wait at McDonald's for the arrival of the police officers. True to her word, M.G. remained near the scene and flagged down the police officers when they arrived. She then gave the officers a detailed description of the facts, including that Defendant obtained the gun from the trunk of his car, threatened her, and then placed the gun back in the trunk, and that the 7-Eleven cameras would show the brandishing.

Under Supreme Court authority, there was probable cause to arrest defendant when Officer Gallagher radioed the information about the interview with M.G. (i.e., within 30 seconds of Officer's Kang's search of Defendant), if not sooner. See *Gates*, 462 U.S. at 233–34 (finding probable cause based on a partially corroborated anonymous tip that Sue and Lance Gates were drug dealers who would be going to Florida to obtain drugs). When M.G. reported a crime, she subjected herself to criminal prosecution if the report was false. Cal. Pen. Code § 148.5 (criminalizing the knowing submission of a false police report). Significant weight is given to this fact. *Gates*, 462 U.S. at 233-34. Moreover, "even if [this Court were to] entertain some doubt as to an informant's motives, [her] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles [her] tip to greater weight than might otherwise be the case." *Id*. at 234. Further bolstering the reliability of M.G.'s report is the fact that she "came forward personally to give information that was immediately verifiable at the scene." *Adams v. Williams*, 407 U.S. 143, 146

9

(1972). If M.G. were lying, it would make little sense for her to suggest that Defendant placed his gun back into the trunk of his car or that the 7-Eleven cameras would show Defendant brandishing the gun. If false, these readily verifiable facts could have exposed M.G. to a charge of making a false police report. Under the totality of the circumstances, there was probable cause to arrest Defendant. *See id.*; *see also United States v. Butler*, 74 F.3d 916 (9th Cir. 1996) (finding probable cause to arrest based on a tip—which included a description of the suspect and the license plate number of his car—by an identified person); *Rincon-Perez v. City of Sparks*, 87 F. App'x 619, 620–21 (9th Cir. 2004) ("Together, the officers' discovery on [the defendant's] lawn of a motocross bike matching the victim's description and the victim's unequivocal eyewitness identification within 35 minutes of the crime, provided, at the time they effectuated his arrest, sufficient grounds for the officers' belief that there was a fair probability that [defendant] had committed the crime.").[7]

In evaluating probable cause, the Court considers the facts known to the officers at the time of the arrest based on the collective knowledge doctrine. That doctrine allows for the aggregation of knowledge among law enforcement officers during an investigation in determining the existence of reasonable suspicion and probable cause. *United States v. Jensen*, 425 F.3d 698, 704-05 (9th Cir. 2005). As the Supreme Court stated in *Illinois v. Andreas*, "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all." 463 U.S. 765, 772, n.5 (1983). The doctrine "exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation . . . ." *Jensen*, 425 F.3d at 704–05. The Ninth Circuit has "applied the collective knowledge doctrine regardless of whether any information giving rise to probable cause was actually communicated to the officer conducting the stop, search, or arrest," though "the cases suggest a limited requirement that there be a communication but not

---

[7] Defendant also argues that any suspicion of wrongdoing was dissipated by a third-party witness's account that M.G. had acted aggressively towards Defendant and by the fact that Defendant cooperated with the officers. An officer may not "disregard facts tending to dissipate probable cause." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 691 (9th Cir. 2019). These facts, however, do not destroy the existence of probable cause. At most, they cast doubt on who instigated the confrontation between Defendant and M.G.

10

necessarily the conveyance of any actual information among officers." *United States v. Ramirez*, 473 F.3d 1026, 1032–33 (9th Cir. 2007) (cleaned up). This limited requirement is designed "to distinguish officers functioning as a team from officers acting as independent actors who merely happen to be investigating the same subject." *Id*. at 1033 (cleaned up). Here, the officers were dealing with a fast-paced response to an emergency call, and they were generally in communication throughout their response. It is therefore appropriate to consider the facts known by Officer Gallagher and Halcromb when Officer Kang encountered Defendant. In any event, even without any reliance on the collective knowledge doctrine, Officer Kang had probable cause to arrest Defendant based on the 911 dispatch, Officer's Kang's observations of the matching description of Defendant and his car, and Officer Gallagher's radio call reporting the contents of the interview with M.G.

Once the officers had probable cause to arrest Defendant, they were legally justified in searching him incident to the arrest. *See Davis v. United States*, 564 U.S. 229, 232 (2011) ("[A] police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person and the area 'within his immediate control.'" (quoting *Chimel v. California*, 395 U.S. 752 (1969))). The officers were also legally justified in searching his car under two exceptions to the search-warrant requirement. The search was permitted incident to the arrest because the officers had reason to believe that Defendant had committed a crime with a firearm, and that the firearm would be located in the vehicle. *See Arizona v. Gant*, 556 U.S. 332, 343 (2009) (authorizing "a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle'" (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004))). The search also fell within the automobile exception to the search-warrant rule. *See United States v. Brooks*, 610 F.3d 1186, 1193 (9th Cir. 2010) ("Under the automobile exception to the warrant requirement, police may conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains evidence of a crime.").

Thus, there is no legal basis to suppress the evidence found on Defendant's person and in his car.

C.

Even if there was a de facto arrest when Officer Kang handcuffed Defendant, and even if there was no probable cause to arrest Defendant at that time, the challenged evidence would not necessarily be subject to the exclusionary remedy.

As the Ninth Circuit recently stated, "[a] Fourth Amendment violation requires suppression of evidence only if the violation is a 'but-for' cause of the government obtaining the evidence." *United States v. Rosenow*, 50 F.4th 715, 736 (9th Cir. 2022) (citing *Hudson v. Michigan*, 547 U.S. 586, 592 (2006)). Indeed, the Supreme Court has stressed that "but-for causality is only a necessary, not a sufficient, condition for suppression." *Hudson*, 547 U.S. at 592. This necessary condition is absent when the challenged evidence inevitably would have been discovered through legal means. See *Nix v. Williams*, 467 U.S. 431, 443 (1984) ("[T]he derivative evidence analysis ensures that the prosecution is not put in a worse position simply because of some earlier police error or misconduct.").

In this case, the prosecution has proven by a preponderance of the evidence that the evidence sought to be excluded would have been legally discovered. Officers Gallagher and Halcromb were pursuing an investigation that inevitably would have led to the lawful arrest of Defendant and the search of his person and car incident to that arrest. As discussed, the interview of M.G. provided probable cause to arrest Defendant, and Officer Halcromb radioed fellow officers that there was probable cause to search Defendant's vehicle. When Officer Chel opened the trunk, where he believed the gun was stored, he saw drugs in plain view. Chel Decl. ¶ 8. At that point, he had probable cause to believe the entire vehicle contained evidence of a crime, and the search of the Mercedes-Benz was permissible. See *United States v. Collins*, 827 F. App'x 721, 723 (9th Cir. 2020) (significant quantity of marijuana and scale in plain view, in addition to large quantities of cash found on suspect's person, "in combination with the facts already known to the officers, [] provided probable cause for the warrantless searches of [defendant's] vehicle pursuant to the automobile exception to the Fourth Amendment."). From these facts it follows that Defendant would have been arrested and he and his car would have been searched, resulting in the discovery of the physical evidence sought to be suppressed.

Accordingly, the evidence allegedly obtained from a Fourth Amendment violation would not be subject to suppression based on an exception to the exclusionary rule.

### III.

In addition to the Fourth Amendment challenge, Defendant argues in a short paragraph that the statements he provided when questioned by Officer Kang violated his Fifth Amendment rights against self-incrimination.

An individual who is subject to custodial interrogation is entitled to the familiar warnings set forth in the case of *Miranda v. Arizona*, 384 U.S. 436, 444, 473–74 (1966). While Defendant was detained, the police asked him several questions, including whether the Mercedes-Benz belonged to him, whether he had gotten into an argument with someone, whether he was a security guard, and whether they could search his car. Defendant contends that he was in custody at the time of this questioning and entitled to—but undisputedly not provided—Miranda warnings.

This Court already has concluded that the detention at the time of the questioning amounted to a Terry stop rather than an arrest. The Supreme Court has held that brief questioning during a temporary detention in public may not constitute a custodial setting triggering Miranda rights. *Berkemer v. McCarty*, 468 U.S. 420, 435 (1984) (brief and temporary detention did not constitute custodial setting triggering Miranda rights). "Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id*. at 439. Here, Officer Kang's questions were brief and nonaccusatory, probing basic information that appeared to stay within the bounds permitted in *Berkemer*. The officer briefly explored the issue of identity—e.g., if the Mercedes-Benz belonged to him and if he had identification. The officer also briefly asked questions aimed at confirming or dispelling suspicion—e.g., if Defendant was a security guard, what type of work Defendant did, and if Defendant had gotten into an argument. The total number of questions was minimal and occurred in public. In these circumstances, Defendant's Miranda rights were not violated. *See United States v. Davis*, 530 F.3d 1069, 1081–82 (9th Cir. 2008).

IV.

For the foregoing reasons, the motion to suppress is denied.

IT IS SO ORDERED.


Date: November 15, 2022

_____
Stanley Blumenfeld, Jr.
United States District Judge